Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable Court. Thank you. We'll begin this afternoon with the case of Hengle v. Treppa. And to let counsel know, I'm Judge Niemeyer. You may be able to recognize our voices. We have online Judge King and I'm right here. That's Judge King and then Judge Rushing. Good afternoon. And you'll be able to recognize the three voices, I think. So why don't we begin, Mr. Killereau, with you. Thank you, your honors, and may it please the court. The district court issued a number of rulings on arbitration, choice of law, and sovereign immunity that are inconsistent with controlling precedent. And I'd like to walk through them today in that order, subject to your honors questions. To start with arbitration, there's no dispute that the plaintiffs entered arbitration agreements and agreed to have the arbitrator resolve any challenges to the enforceability of those agreements. The district court held, and plaintiffs do not dispute, that if the Federal Arbitration Act applies under these contracts, then the delegation clause must be enforced because plaintiffs can effectively vindicate their prospective waiver argument in arbitration through section two of the FAA as a defense to arbitrability. Unlike in Hayes, Dillon, and Gibbs, the FAA clearly applies to these contracts and therefore the delegation clause should be enforced. The contracts say that arbitration shall be governed by the Federal Arbitration Act. The transaction involves interstate commerce. And these are all at page 85, 1185 of the joint appendix. Well, why is that? Why is that an issue? It seems to me if you're under the Federal Arbitration Act, you appoint an arbitrator and the arbitration clause points the arbitrator. But as I understand the issue, it's a little bit beyond that. The issue is not whether you're appointing an arbitrator, but whether you in the arbitration clause are changing the claims. The arbitration traditionally just moves the claims from the court or a jury to an arbitrator or arbitration panel. But in this case, the question is, did the arbitration agreement also knock out the claims and change them to claims under the tribe's law, making it exclusive under the tribe's law? And I think that's the rub that's being made. And maybe you could address that. Yes, Your Honor. So first is to moving the trains on the issue of a prospective waiver. If the arbitrator is capable of applying the Federal Arbitration Act, that means the arbitrator can interpret this contract to constitute a prospective waiver. So the arbitrator, like this court, can look at the provisions of the contract and decide whether or not- Well, that's going to be who decides this question. But it seems to me, if you read the face of the arbitration agreement, it defines of what's being conveyed to the arbitrator. And when I read it here, it says that the parties to such dispute will be governed by the laws of the tribe. And then it goes on to say, such election may in no way be construed to allow for the application of any other law other than the laws of the tribe. Now, that's what it says in the- That's what's conveyed to the arbitrator by the contract. And so it seems to me, before we even get to the arbitrator, we have to know what's going to the arbitrator. Well, Your Honor, I think I can answer both of those questions. I think the first point is this. If the arbitrator can also evaluate that same contractual language Your Honor found and interpret it to constitute a prospective waiver, then the delegation clause should be enforced. And we don't think anything in the contracts prohibits the arbitrator from making that finding. I know that- So you don't even want us to construe the arbitration agreement in the first instance in a court? I thought the role of the court is to start with the contract and construe it. And we can give it to the arbitrator and the arbitrator can determine the scope of its arbitration, the arbitrability of issues. But here, we're talking about the very conveyance by the contract to the arbitrator. And it seems to me that as a court, we should be able to construe that. But let's pass up who's going to construe it for this moment. Because that- Your issue, I understand your issue. If we have the authority to construe the contract, should we follow our other cases in this circuit, which condemn the notion that you can change the claims and initiate the claims that the plaintiff brings? You should not, Your Honor, because that's not what these contracts do. First, unlike in the previous contract- Just address the language I brought to your attention, though, that says the contract shall in no way be construed to allow the application of any other law other than the laws of the tribe. And of course, the claims here were brought under the laws of Virginia and the federal government, the U.S. government. Your Honor, we think that that provision in context does not do what Your Honor is suggesting it does. We think all that- I just read it. I just read it. Excuse me. I apologize, Your Honor. But we don't think it has the effect that the plaintiffs are suggesting. All that provision does is say that if the party elects to have arbitration in a different location than tribal land, tribal law will still apply. I think you can look at it side by side from the arbitration provision in Henry Schein, for example, which said North Carolina law applied and forced the parties to go to North Carolina to arbitrate. But I also think that if that provision and that language were the only thing that mattered in Hayes, Dillon, and Gibbs, those opinions would be a lot shorter. Instead, in each of those cases, the court emphasized other language that is conspicuously absent from the contracts here. These contracts do not just attempt to apply some subset of federal laws. They say at page 1185 that the transaction involves interstate commerce under the Constitution and other federal and tribal laws, which confirms that the contract anticipates that federal law applies. Well, okay. That's fair enough. That's fair enough. But then how do we construe that clause in the very same page which says only the laws of the tribe shall be applied and not the laws under which the claim is made? The claim is made here that this loan is usurious under Virginia law. That's one claim. Now, the question is that claim disappears if we apply the arbitration clause, right? It would, Your Honor, but vitiating a state law usury claim has never been understood to be a basis for setting aside arbitration. You would need a vitiation of a federal claim to set aside arbitration. Parties are allowed to choose a different source of law, state law versus tribal law, to govern their disputes. The source of law and the choice of law issues are different than the arbitration clause. Arbitration is not intended to vitiate laws. Arbitration is intended to decide who the decision maker will be and the procedural rules to apply. I agree with that, Your Honor, but contracts every day choose Delaware law or South Dakota law. That's a choice of law provision. That's another issue altogether. But I think the practical effect of that is that in arbitration, the party would assert that there isn't a claim under Virginia law or New Jersey law or whatever the case may be. So between tribal law and state law, I don't think that's a basis for setting aside arbitration. What you need under the case is evidence that there's an intent to set aside federal law. And unlike in Hayes and Dillon, there is no language stating that federal law does not apply. There was explicit contractual language in both of those cases, not present here. In Gibbs, the contract expressly said that federal law was looked to only for guidance. This sets aside federal law too. This clause sets aside federal law. It says only the law of the tribe shall apply. Your Honor, we don't think that it does consistent with the language of the contract as a whole. We think there are other provisions of the contract that I've mentioned that clearly anticipate that federal law applies. And I think if there's at most ambiguity on this issue, remember that provision that you're citing does not even mention federal law at all. If you have any ambiguity on the issue, the ambiguity should be resolved in favor of arbitration. The other point I'd note is that the only provision that the district court identified as potentially constituting a prospective waiver is that provision. And if that is the case, severability is teed up for this court on a silver platter. You can take that provision out of the contract and leave behind a fully intact arbitration agreement that is materially similar to arbitration agreements that are entered into by parties every day, and that it chooses a particular source of law to govern disputes and does not displace federal law. If I could address briefly the other two issues, first on choice of law, I think the question before the court is whether it violates Virginia public policy to apply the law of the jurisdiction that does not question in its settlement funding decision in allowing parties to apply the law of Utah, even though Utah does not contain a use-free limit. I didn't understand the court, the Virginia court, to have construed that. I thought they just decided the one issue without reaching the policy on the use-free, because we have a very clear statute in Virginia that makes loans over 12% insurious, and that makes it against the public policy to charge otherwise. That's a matter of public policy. I don't think the Supreme Court addressed that issue in that case, as I recall. Your Honor, we think that the holding of the court is clear. They said the circuit court erred in refusing to apply Utah law in the construction of the loan agreement. The public policy argument was presented to the court, and it didn't reach it. But even if you take settlement funding out of the equation, we think we still win. The law is clear in Virginia that in order to set aside a choice of law clause, you need evidence that the choice of a different law would be immoral and shocking to one's sense of right. What is the legal landscape against which we are construing this claim? You have no Virginia decision, no published Virginia decision, and certainly no decision from the Virginia Supreme Court setting aside the law of Delaware or Utah or any other jurisdiction that does not contain a usury limit. There's nothing like that. You have a Virginia anti-usury law that has many holes and exceptions and allows loans above a 12% interest rate in a variety of different contexts. You have at Joint Appendix 171 a letter from the Virginia Department of Banking and Finance, which is tasked with enforcing the precise laws that plaintiffs are citing, stating that the tribe's businesses are not required to be licensed under the laws enforced by the Bureau, forwarding the complaint by a consumer to the company for its review and response, and the complaint actually attached a loan agreement so the Virginia executive agency there had full awareness of what the interest rate loans are. You also have a source of law in tribal law that, contrary to what plaintiffs have suggested, provides ample protections. It incorporates many federal laws, way more than, for example, Utah law. It prohibits unfair and deceptive practices. It has robust underwriting regimes in place that reject over 90% of applications to make sure that loans aren't going to people who can't pay them back. Can I ask you on this question? You didn't mention it is on a choice of law provision. If the contract in Virginia, say, picks a law of another state, is there not an exception to laws that would violate the public policy of Virginia? We're not aware of a decision that has found that choosing... I'm talking about the statute. Your Honor, I don't think the statute applies in this circumstance for two reasons. First, it talks only about rights and benefits acquired under the chapter, which you wouldn't have if you agreed to apply another source of law. Second, we're not aware of a single decision interpreting the statute to have that effect, and I note that consumers every day in Virginia agree to apply contracts under, for example, provision that you're citing, or the anti-waiver provision, as the plaintiffs have called it, operates to reject that source of law. So maybe those contracts, I'm not sure what cases you're talking about, but maybe those contracts didn't impose an interest limit above the public policy of Virginia. Well, I think if they apply Delaware law, I think the point is there aren't any cases invalidating Delaware law, which is a point in our favor, and Delaware law does not have a usury limit, so it would actually be on par with tribal law in this respect, and we think tribal law, as the amicus brief of the commission reflects, actually provides more protections to consumers than, for example, Utah law, which the Virginia Supreme Court did apply. I see my time is coming short, so I'd like to, if I could, briefly address the ex parte young issue that's presented as well. The baseline position for states and tribes is immunity from suit. They've generally been treated... Those immunities have generally been treated similarly, as the Supreme Court made clear in Lewis, and as it also did in Santa Clara Pueblo. The question then is, how can plaintiffs get around the sovereign immunity that the tribe's official have? Ex parte young is not the answer, because as this, as the Supreme Court recognized in Henhurst, and this court is recognized in both Allen and Antrican, that is a tool for vindicating federal law, which is supreme to state law. What plaintiffs are asking you to recognize is a cause of action that allows sovereign government officials to be held liable in their official capacity and be bound to the laws of a co-equal sovereign. That theory would not just require that the officials of this tribe be subject to the laws of any number of 50 states. It would also require that state officials be subject to potentially 50 or even more contradictory state laws. There's no reason to think that the Supreme Court took that step in Bay Mills. There's no precedent we're aware of allowing sovereign government officials to be held liable for violations of a different- How do you, what's your explanation for the language in Bay Mills when there was criticism about the potential for the decisions, the court's decision? I think it was Justice O'Connor who said, well, you could use an ex parte young type of liability to reach the officials themselves. How do you explain that? I see my time is up, Your Honor. May I respond? Yeah, please. In two ways, and I'll be as brief as I can. The first, we think that what she was referring to there, if anything, was an individual capacity claim. That's what was anticipated in the Palela case that was cited in the decision. Except she relied on ex parte young as the model. Ex parte young is official conduct trying to protect the federal law. Her suggestion was that I think that you could protect state law in a similar fashion against the individual tribe members. Your Honor, may I respond to that as well? Yes, please. Your Honor, she did say ex parte young, but ex parte young is only about federal law. We know it, but you have to understand her language. She wasn't applying ex parte young. She was applying ex parte young model. She was suggesting ex parte young type of exposure in trying to mitigate the harshness of the court's ruling in Bay Mills. What I would say to that, Your Honor, if I may, is that I think that that would be a very surreptitious way to create a dramatic new cause of action that is inconsistent with Penn said that it wasn't new. The majority opinion didn't purport to be creating a new exception. The court cited Santa Clara and said, as we recognize there's something analogous to ex parte young. Now in Bay Mills, it's arguably new because it's applying state law. I'm trying to enforce state law, but the court explained that by saying when members of a tribe leave a reservation, their state law applies to them. And arguably the argument there is that the tribe can't then cloak them with immunity in the same way that a state can't cloak its officials with immunity to violate federal law. So tell us how we should interpret this Bay Mills language. I don't think it's an answer to say, well, this is not federal law. The court knew that in Bay Mills. What are we supposed to do with it? I think what you should do, if I may, Your Honor, is interpret it to permit at most individual capacity suits. But I also think you could interpret it. But that's not what Santa Clara was. Santa Clara was an official capacity. Yes, but under federal law, Your Honor, I think there's a mixing and matching that is attempted here on the other side of saying that because cases were cited that allow perspective relief against officials under federal law, the same must be true of state law. But no one has ever cases. There was no issue or with respect to damage claims. The question is bringing injunctive leave a relief to vindicate a body of law and an ex parte young that is federal law. And in her comments, it suggested injunctions protecting state law. In other words, the question is, why wouldn't it apply? Now you maybe have other answers, but I don't think saying it addressed damage is an acceptable interpretation of those cases. Your Honor, if I may, I agree with that. I think what I was suggesting and said is that there's a difference between an individual capacity action like when Palela, which is one of the cases that the court cited regarding fishing rights and an official capacity action against the sovereign. The latter has not been recognized against tribes or states. The court said later in Lewis v. Clark after this decision that tribal and great surprised states as to tribes to learn that they must comply with the laws of a number of other jurisdictions. And in that respect, you have one state that has come in here, New Mexico, agreeing with our position. And unlike in some of these previous cases, not a single state that has come in on the side of endorsing this type of cause of action. I think it's a cause of action that would cause great problems, particularly today when states are now the federal government. The Department of Justice came in on the other side of it. And they did, Your Honor. But I think in this case, the question is about state sovereignty. It's about whether state officials should be held to account for the violation of potentially up to 50 or more different jurisdictions laws. That's the thicket that this cause of action would open up. And I think it's also inconsistent. Well, I don't understand what the problem is. Is a state of less dignity than the federal law? It seems to me that we could have doctrines that protect state law similarly and tribal law even. I mean, the idea is there's a certain mutual dignity among various sovereigns in their law. And Ex parte Young was to vindicate federal law, of course. But Bay Mills does indicate something beyond Ex parte Young's limits. If I may, Your Honor, that would actually cut in our favor the notion that state laws and tribal laws should be treated on par with each other. As the court recognized after Bay Mills in the recent Franchise Tax Board v. Hyatt decision, it's not okay to hail officials of one state or a state into another state's courts and try to subject it to that state's law. That's the point that we're trying to emphasize here. This sort of loses the forest for the trees. Here we have a tribe taking advantage of its sovereign characteristic under established law and making loans to citizens at 500 to 900 percent interest. This woman, Tiffany Myers, for instance, which is one of the lowest rates, she borrowed $1,200 in cash and was required to pay back $4,800 within nine months. Now, that offends the state of Virginia and its laws and its public policy. She was in Virginia, you guys knew she was in Virginia, and you loaned the money to her in Virginia. The question is, why should a Virginia court tolerate that and let the tribe protect itself while every other banker in Virginia has to comply with the law? This 500 percent, it is unconscionable. Your Honor, there are a few ways to respond to that, but I would say I think the main one actually relates to the fact that Virginia hasn't attempted to enforce that interest against the tribe. Virginia hasn't come in trying to bring the suit. We think that to the lie, they should be of a matter of suits of comity between sovereigns, and both the Virginia Department of Banking and the Virginia Attorney General took to position that Virginia did not in fact bar the loans at issue here. The Virginia didn't make the loan. It was the individuals that made the loans, and they're the ones that are paying this interest rate. I mean, I think one of the fellows in this case borrowed money and is paying back over 900 percent. Does that strike you as, if you said that to any reasonable person on the street, you can predict the reaction? Well, respectfully, Your Honor, I think the relevant reaction here is the reaction of the Virginia Bureau of Financial Institutions, which said that the matter of the interest rates and the loans was for the tribe to decide. We do think that to the extent there's an issue as between Virginia law and tribal law, it should be worked out between the sovereigns, which is what New Mexico has urged. Well, what do we do about the citizens who are borrowing money at these extortionary rates? I mean, we're really talking about high rates, and they borrow at these rates in Virginia because they're desperate, and they need some cash immediately, and they don't foresee that within nine months they have to come up with four times that cash to pay it back. Now, what's that put that citizen? And Virginia has a real interest because these are Virginia citizens who borrowed the money in Virginia. Well, the tribe loaned it from California, but the citizen who borrowed the money in Virginia has never been on the tribe reservation. Your Honor, if I may, the tribe never entered the state of Virginia. The consumers agreed as a condition of their loans that they were entering tribal jurisdiction and seeking it out for purpose of... They received the money in Virginia from you, did they not? That is true, Your Honor, but as part of... And they negotiated their contract with you from Virginia. And in that contract... They received the money and spent the money in Virginia. We don't know where they spent it, we don't know where they are today, but we do know that in that contract... And you're going to enforce it against them in Virginia, right? We would like to enforce it against them in the arbitral forum that is fair and appropriate and applies the FAA and allows them to raise not just claims under tribal law, but any federal law claims that they pass. You're going to take your judgment and you'll lodge the judgment against the Virginia's assets in Virginia, right? Your Honor, I believe that under the contracts, the arbitral judgment would be enforceable in a federal court, or if there's a judgment under tribal law... But the citizens are only in people who do not have wealth. They do not have money. They're not hiring big lawyers and traveling around and firing federal suits. They're making loans. And when you go to collect that loan against them, their assets in Virginia are going to be subject to those loans. That's inherent, isn't it? I don't think that that's right, Your Honor, because in taking out the loan, in the agreement that these parties agreed to, the plaintiffs agreed that their loans were based on tribal law on the internet. How can you enforce it in California against them? Their assets aren't in California. Respectfully, Your Honor, where we enforce it doesn't affect what law applies and where the transaction took place and whether the tribe has left the reservation for purposes of the Bay Mills analysis or any other analysis. The plaintiffs agreed that their loans occurred on tribal land. Virginia, whose interests are the ones that are purported to be endorsed here, has agreed that the tribe can regulate these businesses, and it has not some kind of sovereign interest in protecting the consumers from the loans. And what the tribe has provided, and I think this is the last important point to make, is something quite different from the previous cases Your Honors have construed. If you look at Joint Appendix 67-157, you have the tribe being an open book in telling you why it entered this business, how it entered this business, and the meaningful protections it tries to provide to consumers, which are quite different from anything that any other business this Court has confronted provided. The tribe is attempting to meet a gap in the credit regime, but it's attempting to do so in a fair and transparent measure, and we think it's done so with business practices that are valid as to arbitration, choice of law, and sovereign immunity. Okay. I see that my time is up. To what extent would the arbitrator be circumscribed in the types of relief that could be awarded? Not at all under federal law, Your Honor. That's our core position, and we think it's emphasized by the contracts and by the experience of the arbitration that took place under tribal law. If you look at page 1288, in that arbitration, we took the position, the tribe took the position that the FAA applies. The arbitrator could award the same amount of, evaluate the claims to the same degree as a federal court and to the same extent as a federal court. There's no nullification or waiver that occurs. I thought there was a cap under tribal law. There is under tribal law, but the contracts do not nullify federal law as a separate source of What about state law? You keep referring that there's federal law applicable here, too, or alleged here. There are federal law claims, but there are also state law claims, aren't there? Yes, Your Honor, but no decision of this court has ever suggested that extinguishing state law claims in favor of tribal law is that invalid from an arbitration perspective. There's no decision that says that, and I guess the flip side I'd say is the plaintiffs could try to assert a Virginia law claim, but the tribe would assert sovereign immunity as to that claim as it would hear. But even under that view, it wouldn't be a prospective waiver because the ability to assert the claim is the same. What provision of the Federal Arbitration Act allows the enforcement of a provision that changes the law that of the claim being made? I thought the Arbitration Act was purely a procedural mechanism to allow arbitrators as opposed to courts to decide existing claims, and I'm fairly familiar with the Federal Arbitration Act, and so maybe you can cite me to a provision that you think authorizes the change in the substantive law. Your Honor, I don't think it's about extinguishing claims. I think it's about the effective vindication of claims. That is the rule that has come out of any number of Supreme Court decisions, and if plaintiffs can vindicate a claim in arbitration to the same extent they can understate the claim. This person has a claim under Virginia law and under Federal law, and you say that through their arbitration, which moves it from a court to an arbitrator, they no longer have those claims. And the question is, where's the authority in the Arbitration Act that lets you do that? I don't think that they don't have those claims, Your Honor, but I think, again, take, for example, the contract. They don't have them. I just read you the language. You can only enforce the laws of the tribe. As vis-a-vis state law, Your Honor, and I think that choice in law clauses... Don't say vis-a-vis. It says only. To allow the application of any other law other than the laws of the tribe. In context and taken as a whole, these provisions allow a party to raise Federal law claims to the same extent as in Federal court, Tribal law claims to a greater degree than in Federal court, and State law claims to the same degree as in State court. If a plaintiff tried to bring a Virginia claim in arbitration, I suspect that there would be a sovereign immunity defense asserted to that just as in Federal court that in no way impairs the plaintiff's ability to raise the claim. The touchstone is effective vindication, and the position we are taking... Yes. One question on your point about Federal law to the same extent as in Federal court. Are Tribal damages available in these arbitrations? I read the... I read Tribal law and the contracts that suggest to the contrary. I think in Tribal law, as under some States law, Tribal damages are not allowed, but under Federal law, Tribal damages would be allowed, and in the contract at page 1185 of the joint appendix, the contract talks about allowing statutory damages, so I think it would allow that type of damage. That's under the RICO section, correct? Yes, Your Honor. And the plaintiff's... Yes, Your Honor. So a party could bring a RICO claim and collect its Tribal damages in arbitration. Subject to the same defenses as in Federal court, yes. Well, the defenses would be that you're immune, right? There are no claims against Tribal authorities under Tribal law, are there? Under Tribal law, I do believe the Tribe has allowed claims to be brought by the language of the arbitration agreements. Against the individuals? Which... Yes, under the... Tribal members. Yeah, I think under the agreements, Your Honor, Tribal law claims can lie. So if the parties can raise a claim under Tribal law, an unfair and deceptive trade practices claim... No, I'm talking about RICO. RICO, I think, would apply in arbitration to the same degree that it applies in Federal court. So the plaintiffs have asserted a RICO defense in Federal court. The District Court has evaluated that claim and found it wanting as to our clients. The arbitrator would have the same ability to reach the same decision. And so the ability to effectively vindicate rights is present in arbitration. And I think that's all that the FAA requires and what the Supreme Court has required in its cases. Okay, we've given a little extra time here. I appreciate it, Your Honor. Thank you. No, it's an important issue. It's an important issue. Okay, I guess we'll hear from Mr. Price. Is that next? Yes. Thank you, Your Honor. And may it please the court. My name is Matthew Price and I'm representing the individual defendants, Scott Asner and Joshua Landy. My colleague has covered a lot of material, so I'll be brief. But returning to the issue of prospective waiver and the arbitrability here, I think it's important to recognize that the arbitrability is fundamentally different than the ones this court addressed in Hayes and Dillon and the Gibbs cases. The agreements contain several provisions that respect federal law and invoke it and no provision expressly displacing federal law. And I'll get to the provision that you, Judge Niemeyer, identified in a moment. But I want to highlight, first of all, that the agreements expressly adopt the FAA and with the FAA, the principle that an arbitration agreement cannot prospectively waive federal rights. They also expressly state that the applicable substantive tribal law consistent with the FAA and thus consistent with the federal rights that the FAA protects. And the agreements in the other cases contain no such language. The agreements here also expressly say that they involve a transaction involving both interstate commerce and Indian commerce under the U.S. Constitution and other federal and tribal laws. And so expressly acknowledge the applicability of federal law and by invoking the interstate commerce clause, acknowledge the panoply of federal consumer protection laws, as well as RICO, that were enacted under that power. And again, Hayes, Dillon, and Gibbs, the agreements contain none of these provisions, but quite to the contrary, each have language saying that no United States federal law applies to this agreement or that no federal law or regulation shall apply. And in Gibbs, the agreement said the contract was governed only by such federal law as is applicable under the Indian commerce clause, which is as near as I can tell a vanishingly federal law. And so again, these agreements here are fundamentally different. The agreements in those other cases also limited the arbitrator to remedies under tribal law or required enforcement of the award to occur in tribal court. And neither is true here. So we think that the contracts here do not prospectively weigh federal rights and are clear in doing that. But I recognize the provision you pointed to, Judge Niemeyer, which is the second paragraph of Section 4. And what I would say is if you read that provision alongside the others, I think at the very worst, you're faced with an ambiguity as to how to reconcile the provisions. But the Supreme Court has said time after time after time that courts may not resolve ambiguities in a manner that avoids arbitration. To the contrary- Are your clients claiming immunity? My clients don't have immunity. They're individuals. They're non-tribal member individuals. So no, we don't have any immunity. And there's a strong thumb on the- What's your defense to a damage claim under RICO? Our defense to the damage claim under RICO is that the RICO claim is dependent upon state law claims, and we don't think Virginia law applies. I mean, we have other defenses too. For example, my clients stop being involved- What if we were to include the Virginia usury law was a matter of public policy and is an exception to the choice of law provision? Well- And we applied Virginia law. Would your clients then be subject to Virginia law and RICO? Well, I think that, Your Honor, I think that would be a question for the arbitrator to decide in arbitration, whether that's so. Well, this nature of the claim I'm talking about, even if it's arbitrated, the arbitrator, you guys, both of you, put more into the Arbitration Act than the Arbitration Act carries. The Arbitration Act is to seek a decision maker, and it was to avoid the hostility that courts originally treated arbitration clauses because of the notion that the courts only should be deciding these matters. And so in order to recognize that arbitrators could substitute as judges, the Federal Arbitration Act protected that, but it did not address all the things that you guys loaded into the arbitration clause. I see my time has expired, if I may, Your Honor. Yes, of course. Thank you. The Federal Arbitration Act does not prohibit parties from agreeing to choose one form's law over another form's law. That's something that parties do every day in commercial... That's just general contract law. That's correct. And that's what's been done here, except the choice of law has been tribal law over state law. What the FAA does prohibit is a prospective waiver of federal rights. But I also think if you're going to apply straight contract law, choice of law principles, there's always been an exception for laws in the forum state that are the public policy of the state. In other words, choice of law that avoids the public policy of the state have not been enforced. That's an exception to the choice of law provisions. And so I'm hypothesizing that if we were to conclude that, then Virginia law and RICO would apply. Isn't that right? Well, I think that's right. But again, I think, Your Honor, that that's a question that the arbitrator would need to decide in the context of the arbitration. If the case goes to the arbitrator to decide, those arguments can be raised in the arbitration and therefore the arbitrator to decide. But I think that the court shouldn't jump ahead and decide a merits issue in a case that really should be sent to the arbitrator in the first instance to resolve questions of that kind. Okay. Well, thank you. Why don't we hear now from Mr. Wessler? Thank you, Your Honor. Yes. Matthew Wessler for the appellees. Over the past six years, the federal courts, including this court, four separate times, there are more than a dozen district courts that have followed suit, have reached a unanimous consensus that the type of tribal arbitration loan contract at issue here is categorically unenforceable. As I think Judge Niemeyer, you articulated quite well, the consensus reflects a basic understanding that these contracts are all designed not to do what a normal contract does under the FAA, which is simply alter the forum, but instead to eliminate a consumer's right to pursue relief for any federal or state statutory violations. They argue that this contract is different from the ones that we adjudicated in our other cases. How do you address that? Sure. So it isn't, it's virtually indistinguishable from the contracts that were invalidated just last year in Gibbs. And I'm happy to walk the court through why that's true. And I think I'll start right where you started, Judge Niemeyer, which is the clause that specifically bars an arbitrator from applying any law other than the tribal law. And in take a step back, in Hayes and Dillon, which are the first two decisions from this court, there were additional clauses in the contract that explicitly disclaimed federal law. So in addition to saying an arbitrator can only apply tribal law, the contract also said, and no federal or state law shall apply. In the wake of those decisions, what some lenders did was they just blue penciled out those references to federal or state law in an identified by Hayes and by Dillon. And that was true in the contracts that this court invalidated in the two Gibbs cases, Sequoia and Haynes. In both of those cases, and I'll point the court specifically to page 342 of the Gibbs versus Haynes decision, which I think walks through exactly why these contracts are invalid under the FAA. The court there said the loan contracts, the Great Plains and Plain Green contracts don't explicitly preclude the application of federal law. In other words, there's nothing in the contracts themselves that say no federal law shall apply. But let me ask you this, what if we were to extricate the clauses that I quoted to the other side and treat them as part of the choice of law language and not the arbitration clause? In other words, the arbitration clause we would interpret simply as a straight on arbitration clause conveying arbitration power to an arbitrator in Virginia. I don't think at the ball of choice, and we treat that as a part of the choice of law. Where does that lead? Well, I have two things, I guess, to say about that, Judge Niemeyer. The first, I don't think you can simply excise out the offending provisions of this arbitration clause. That same severance argument has been made in every single one of these cases and it's been rejected. And that's because it's an integrated set of provisions that strike at the core of what this loan contract is designed to do. But even if you attempted to kind of pull them out and treat them just as choice of law provisions, the choice of law provision itself would still be unenforceable. It would be unenforceable for several reasons. And I'm happy to walk through why I think it's unenforceable. But first and foremost, if this contract operates as a prospective waiver under the FAA and is invalid, it is also invalid under generally applicable contract law outside of the FAA. In other words, the reason why it's unenforceable as a matter of arbitration law is the same reason it's unenforceable as a matter of general contract law. And I think the Supreme Court in Italian colors made this point quite clearly, which is- Start from the ground proposition, forget the arbitration laws. Let's assume this contract simply said, when you sign this contract, you're not, we're going to be bound by tribal law and there's going to be no federal law or state law applicable. Yes. Is that unenforceable? It would be unenforceable. It would be unenforceable under fundamental Virginia public policy. And in particular, I'll point this court to section 6.2306, which is what we call the anti-waiver statute. And what that statute says very clearly is that any contract, any agreement or contract in which forces a borrower to waive the protections of Virginia's usury laws is deemed to be against public policy and void. Now, you asked my colleague on the other side, you know, how is it, how is this not a violation of Virginia's public policy? And what he said was, oh, well, there's, you know, no Virginia Supreme Court has really taken a position. We can't identify any other lower court decisions. There's a Virginia agency that has suggested in an informal letter that out-of-state lenders can lend at higher rates. What he assiduously avoided discussing is what the Virginia legislature has said. And as this court has made clear in Volvo Construction and as the Virginia Supreme Court has also made clear in Blake Construction, to answer the question of what Virginia public policy is requires a very simple question. It's just what did the legislature do and say? You look to the legislature. Has the legislature articulated a specific public policy that prohibits what the contract is trying to do? And here, and not only just we look to the legislature, but we look to a specific section in a statute that is an anti-waiver provision. And if there's an anti-waiver provision that prohibits a contract from compelling a party to waive protections and benefits available to them under state law, and that provision identifies the anti-waiver protections as being a fundamental public policy, that's the end of the inquiry. And section 306 couldn't be clearer. The title of that provision is waiver of rights violative of public policy. Council. Council. This is Joe Dresching. I have a question about that sort of line of reasoning. And you may be right, but it seems to me that the upshot of your argument is that any loan agreement entered into by a citizen of Virginia or in Virginia could not choose another jurisdiction's law under your argument that there must be, you know, many cases in Virginia striking down choice of law clauses because they violate the anti-waiver provision because they've chosen any state other than Virginia, right? Because someone has been, to waive their rights under Virginia's usury law. I haven't seen those cases and you haven't pointed any out. So it suggests to me that maybe your interpretation of that provision is incorrect. Tell me why that's wrong. So I don't, I don't think it's incorrect. And I think there are cases in particular, the North Carolina or the, I'm sorry, the net credit financial case is a case from Virginia trial courts that has recognized that, that, that out-of-state lenders are disabled from, from compelling Virginia borrowers to pay more than the lending rates or interest rates that have been set by Virginia statute. In addition, in the, in the, let me ask you, that raises a distinction coupled with Judge Rushing's question. Is the public policy a policy that you can't charge usurious rates and waive the public policy of Virginia that limits those rates, say to 12%, or is the public policy that you can't rely on a foreign law, regardless of what it says? In other words, I'm assuming if a foreign state, outside state, provided for 10% usury and the contract called for enforcement of that law, Virginia wouldn't strike it down, would it? No, that's correct, your honor. And, and, and does the statute insist on Virginia law or does the statute insist on a usurious, a non-usurious rate? It insists on a non-usurious rate and it's even more favorable for other states and other lenders beyond just that 12% rate, right? Because the statute specifically exempts categories of lenders from the 12% usury rate. And so for instance, a national bank, the bank that, that, that was doing the lending installment funding itself is not subject to this 12% usury limit. It in fact is entitled to rely on whatever interest rate it imposes as a matter of contract. The same, the same is true for other kinds of lenders, including small- Is that a supremacy clause exception? Well, it's, it's, it, it, it's the, I, the, the pre, the nature of the preemptive question is reflected in Virginia law, right? So the Virginia legislature codified essentially that supremacy clause issue by exempting banks from this usury limit. Small dollar lenders- What do you make of the 2021 amendments to Virginia law where they, they try to reach out and, and apply Virginia law to these sorts of online lenders? Your, your colleague on the other side says that suggests that, that these lenders were not covered by Virginia policy. So it's, I think it's out of the frying pan and into the fryer, fryer for them. They're either covered by, by section 1500 or they're not. 1500 is different from the anti-waiver provision that I was just discussing, Judge Rushing. And what they say is we weren't subject to this, to the, to this chapter 1500 provisions. If that's true, then they are subject to the 12% usury limit that's imposed under chapter 300. Chapter 1500 actually creates a safe harbor for out-of-state lenders to, to offer loans that have higher interest rates than the 12% usury rate. And so for instance, small dollar lender in Utah or New Mexico or Texas, anywhere can offer a loan up to 36, 36% interest, which is consistent with how most states operate and, and what interest rates they allow. But if they don't want, if they take the position that they're outside of that, and we don't think they are, and they haven't cited a case ever suggesting that chapter 1500 was, was that they are under chapter 300, which is a 12% rate. So either way, they are, they are, they are limited in what they can do in Virginia by virtue of Virginia's strong public policy that has been on the books over a century prohibiting usurious loans like the ones that are at issue here. And so if I could just circle back quickly. But all these issues would be, could be raised and arbitration in the arbitration as well, couldn't it? No, your honor, none of them could. And the reason none of them could, and again, I was just about to circle back to this, is because the arbitrator is flatly and categorically prohibited from applying any law other than tribal law. And if you go to tribal law, if you actually go to the code, and here I'm on page 10, excuse me, 267 to 282 of the joint appendix, you will see that the entire process under tribal law is a sham. It's a rigged procedure designed to eliminate a consumer's ability to pursue any of the claims they have under federal or state law. And it's actually worse than the process that was created in the Gibbs case that this court invalidated last year. Now there are three tribal code provisions in Gibbs that the court identified as creating the operative prospective waiver. The first was a provision that identified some federal law that tribal lenders would have to comply with, but exempted RICO. The same is true here. The second provision identified by the court in Gibbs was a provision that exempted certain related entities from any liability under tribal law. The same is true here. And the third provision that the Gibbs court identified was a provision basically creating a Kafka-esque consumer dispute resolution process that effectively operated to prevent a consumer from being able to do anything under tribal law. Well, the same is true here, but it's worse in this case. And the reason it's worse is you can't even go to arbitration in this instance. And here I'm specifically, I'd like to just specifically point the court to J281 and 282, which is the section 11.5 of the tribal code. It explicitly prohibits the application of any arbitration. There's no jurisdiction for an arbitrator unless and until a consumer goes through this internal tribal dispute resolution process. And that process is run by the same individuals who run the lending operation itself. It allows those individuals to conduct an inquiry in whatever way they want for the claims. And then it restricts an arbitrator in any arbitration to only reviewing what the commission does internally and how it resolves the claims. And it bars an arbitrator from awarding injunctive relief, treble damages, attorney's fees. That is all codified in the tribal code. And because an arbitrator's power and authority is restricted by the contract itself, there would be no authority, Judge King, for an arbitrator to do anything other than enforce this contract as written and apply the tribal laws in the way that they're designed, which is to rig this entire system to prevent or eliminate a consumer's ability to pursue their claims. I see that my time is about to expire, and I'll reserve the rest of my time for rebuttal to discuss the remaining several issues. Thank you. All right. I think we're back to Mr. Killaroo. Yes. Thank you, Your Honor. I'd like to start with where Mr. Wessler ended because the argument he made is both offensive and wrong. It is not true that these contracts prohibit a party from going directly to arbitration. The contracts expressly say, and tribal law expressly says, that if a consumer is aggrieved by an action of the licensee, which would be the tribal lender, the request for dispute resolution must be made in accordance with the terms of the loan agreement. And here, the loan agreements require arbitration under AAA and JAMS. You don't have to take my word for that because we move to compel arbitration, not to force the plaintiffs to go to a tribal forum. And you have in the Joint Appendix at page 1288 an example of an arbitration that occurred through these contracts. And there, we went to JAMS arbitration and did not suggest that there has to be some kind of rigged procedure, as Mr. Wessler suggested. So that's just not- Could the arbitrator require the dispute mechanism to be followed? No, Your Honor. I think the contracts say that the dispute would go to AAA and JAMS arbitration. That's what's- I understand, but you're giving the arbitrator full authority to apply, decide the scope of arbitration and to apply tribal law. Now, if tribal law has a dispute mechanism and it says that's a prerequisite to making claims, couldn't the arbitrator apply that? No, Your Honor, because in tribal law at page 277, it says the dispute resolution must occur in accordance with the terms of the agreement. And the agreement says that you go to AAA and JAMS arbitration. So that's what would happen. So your argument is the contract itself bypasses the- By operation of tribal law, yes. Now, I think it's important to know- Well, I thought we were supposed to look just at the contract and not tribal law. Either place- You're caught up in your own argument. Your argument is that we follow the contract, which says we're not supposed to decide anything. We send it all to the arbitrator. And the arbitrator now is applying the tribal law, not us. Your Honor, you- And you say the tribal law says we go back to the contract to decide whether the dispute mechanism's there. I think the point I'm making, Your Honor, is no matter where you go, you end up in the contract. The contract says apply JAMS and AAA arbitration. Tribal law says you should do the same thing. Either way, you end up in the same place, which is in front of an arbitration. I think that then the big question is what happens in that arbitration? Mr. Wessler said that these contracts are identical to the contracts in Gibbs, and that is just not right. These contracts do not say that federal law can be looked to only for guidance. They do not attempt to limit the scope of federal law to laws under the Indian Commerce Clause. They do not attempt to constrain the review of an arbitrator's decision in any way. They allow a party to go directly to federal court to enforce arbitration under a straightforward application of the Fourth Circuit's decisions in McCormick and Corbis. So you have an arbitral mechanism in which the arbitrator can evaluate a prospective waiver challenge, can evaluate federal law claim to the same extent as in federal court, can even evaluate plaintiff's argument that Virginia law should apply. So the arbitral forum is exactly the same in all material respects as a federal court. You know, you seem to ignore the elephant in the shop. If the arbitration agreement is not enforced, then the claimants in this case are free to argue that public policy in Virginia should apply, and Virginia state law should apply, and federal RICO should apply. If you go to arbitration, on the other hand, then it says you're only to apply, you're applying no other law but tribal law. And so the arbitrator now is applying other law, which is not the Virginia law, nor is it the federal law. He's applying only tribal law. Now that's a difficulty because now up front you have the claimants borrowing money and waiving all their right in advance. Your honor, if I may respond, we don't think the contracts do that, but if you think that that's what they do, the clear answer is to just get rid of the elephant. Sever the provision of the contract that says that has the effect that you think it has, and you then have a fully intact provision that allows arbitration of federal claims, of state law claims, of plaintiff's choice of law arguments that is an effective forum for them to vindicate their federal rights. Mr. Wessler didn't identify a single provision other than that one, and the district court didn't either that constitutes some kind of prospective waiver. You can take that out and you can have a full, fair, effective vindication of federal rights, which is all the law requires. Okay, thank you very much. I think, what's the rebuttal you're on? Is there a cross claim? There is, there is, Judge Niemeyer. It involves the district court's decision that RICO does not permit private parties. Oh, I understand that. Okay, you have five minutes on rebuttal. Just briefly on this, your honors, we think the district court erred when it interpreted RICO to foreclose the availability of injunctive relief for private parties, and I don't think we need to spend a ton of time on this. I think the party's briefs do a fairly comprehensive job in identifying the issue. There really are, I think, two ways to read. Now, this is part of the Department of Justice again. They came in here and they say that this equitable relief under RICO is correct. That's correct, Judge King. Now, if you say that's wrong. Correct. Right. Yes, and I think the reason it's wrong, Judge King, is because the text and structure of the three provisions under RICO make clear that the government does have a unique set of remedies available to it that is unavailable to private litigants, but it's interim preliminary injunctive relief. The availability of permanent injunctive relief, the language of subsection A, is relief that is available and extends to anybody seeking to restrain violations of the statute, and so the government would have this court read the specific remedies that are granted to it under subsection B and extend the limitation on the remedies in A in a way that would, I think, be inconsistent. I think it would be fair to the government, and maybe to be fair to the text, A is the grant of the scope of authority that district courts have. It can do a whole range of things. B is designating the government's authority, which includes injunctions, and C, private citizens' treble damage actions, and the real problem is you can make a case the way you made it, and some courts have been right with you, but the question you still have to answer, I think, is the way the Supreme Court has treated RICO, and in the context of, because it's modeled after the Clayton Act, the court has applied Clayton Act type of limitations issues in RICO. The court has applied the direct injury limitations in RICO, like in the Clayton Act, and my guess is the court would also apply the anti-injunction the way Clayton Act does. It's never been really comes down to maybe you raise an ambiguity. I'm not sure that's the best reading of the text, but it is a reading, and the question is then we're faced with should private citizens have the right to injunctive relief, and the government weighs in on that, which I would call the traditional notion, and I'm not sure the Supreme Court would go along with any other notion if we're faced with it, but that's just a prediction, and we would still have to decide which way to go. As you know, courts have gone both ways. You're asking us to resolve a circuit split on this, aren't you? Yeah, well, I don't, well, sorry, yeah, I mean, there will be, there is a split already, so I think regardless of what, you know, what this panel does, that split. You're saying we could join either side of the split. Exactly. I mean, the Second Circuit twice has come out our way. The Third Circuit has come out our way, and then the Ninth Circuit has come out the other way. I think, you know, my only suggestion is that, you know, isn't there another circuit that went the other way too? I don't think so. I thought it was 2-3, but that's okay. Well, I think, at least in my understanding, it's the Second and Seventh on one side and the Ninth on the other. I will say, you know, in our view, the Ninth Circuit, which was the first circuit to weigh in on this, you know, and came out in favor of the defendant's view of how the statute should work and the government's view, you know, has really refused to engage in a textual analysis of the statute. Judge Niemeyer, you suggest there's ambiguity. I would suggest that the only authority for foreclosing the availability of injunctive relief is the dubious reliance on legislative history about what certain Congresses chose not to do. Except it's not dubious because the Supreme Court probably, I bet you four or five times, has relied on it. And the Supreme Court has uniformly weighed in in favor of applying Clayton Act jurisprudence to the RICO. And one of the biggest ones where they highlighted the direct injury requirement under treble damages, they made clear that the language doesn't support it, but Clayton Act does support it, the interpretations of direct they've applied to RICO. And the language of B, C could have said the private citizens have rights of injunctive relief also, but it converged, just like in the Clayton Act, it gave treble damages to private citizens. So there is a way to construe it. Now, the way you're advocating is to take A and make it a summary conveyance of remedies applicable to both B and C. But yes, exactly, which I think is actually, I think that's consistent with the way that the Supreme Court has understood statutes like subsection A. And in Steel Code, that's exactly what the Supreme Court said. It said, look, a provision that does more than just grant jurisdiction to a district court, where the provision authorizes general remedies, those remedies are applied to any claim, and B and C operate to restrain a unique set of remedies that are available only to a specific kind of party. To the Second Circuit, at least, that was compelling, and the Seventh Circuit also has adopted that understanding, which, I mean, just by the way, Judge Nimoy, I mean, I think if you read Chevron, and if you read the NOW case from the Seventh Circuit, they engage with the Clayton Act. The Clayton Act also authorizes injunctive relief, and the kind of broad remedial goals of both statutes should, I think, be applied in a consistent way, which would mean, at least in some context, the availability of injunctive relief for private parties, because that's what A does. It authorizes courts to restrain any violation through a series of injunctive remedies, and any violation would apply regardless of who the party is. I think the alternative approach... Well, then they wouldn't have needed B or C at all. They could have just simply said, this provision is enforceable by the government and by private parties, and with respect to private parties, we'll award treble damages. That's all they really would have had to say. Well, I think that is, in effect, what they have said. I think B says, and the government can... I understand your argument. I understand. Okay. Yeah. Let me ask you this. If... This is totally hypothetical, but if we were to conclude that this follows the Clayton Act model, what is the consequence to this case? Well, just so I understand, by following the Clayton Act... If we were to conclude that RICO does not confer on private citizens the right to obtain injunctive relief, what does that do for this case? Well, it would certainly knock out those injunctive relief only claims that we pursued against the individual officials, but it would leave in place the rest of the claims that we have in the case. Okay. Any other questions from my colleagues? I'm fine. No, sir. You people were great. I'm going to tell you, this is a dicey area, and you were both, all three, very effective. Our tradition now would be to come down and shake hands with you, congratulate you on the great arguments, and tell you we are made more confused than we were before, but we're unable to do that now, and we virtually shake your hands now and greet you on behalf of the court, and I hope you come back to visit us, and we can shake hands in person again at that time. Thanks so much, and have a good day. We'll proceed on to the next case.
judges: Paul V. Niemeyer, Robert B. King, Allison J. Rushing